1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GREGORY EUGENE BISEL,                   No.  1:17-cv-00013-DAD-SKO (HC)

12                  Petitioner,              **FINDINGS AND RECOMMENDATION
                                             TO DENY PETITION FOR WRIT OF**
13        v.                                 **HABEAS CORPUS**

14   RAY FISHER, JR.,                        **[THIRTY DAY OBJECTION DEADLINE]**

15                  Respondent.

16

17        Petitioner is a registered sex offender and state parolee proceeding *pro se* and *in forma*

18   *pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He raises

19   numerous claims challenging a conviction sustained in Fresno County Superior Court.  As

20   discussed below, the Court finds the claims to be without merit and recommends the petition be

21   **DENIED.**

22   **I.        PROCEDURAL HISTORY**

23        On April 10, 2014, a Fresno County jury found Petitioner guilty of two counts of

24   annoying or molesting a minor, with a prior felony conviction (Cal. Penal Code § 647.6(c)).

25   (Doc. 31 at 1.[1])  In a bifurcated trial, the court found true the allegations that Petitioner had

26   suffered one prior strike conviction (Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)), and that he

27   had served one prior prison term (Cal. Penal Code § 667.5(b)).  (Doc. 43-1 at 10-11.)  On May 9,

28   ─────────────────────
     [1] Unless otherwise noted, references are to ECF pagination.

1   2014, the court sentenced Petitioner to a term of fifteen years and eight months. (Doc. 43-1 at

2   11.)

3          Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

4   DCA"). On August 10, 2016, the Fifth DCA affirmed the judgment. People v. Bisel, 2016 WL

5   4211767 (Cal. Ct. App. 2016). Petitioner filed a petition for review in the California Supreme

6   Court, but the petition was denied on October 19, 2016. (Doc. 13-4.) Petitioner next filed five

7   petitions for writ of habeas corpus in the state courts. (Doc. 43 at 5-13.) The California Supreme

8   Court denied the final petition on June 12, 2019. (Doc. 43 at 13.)

9          On October 19, 2019, Petitioner filed a first amended petition. (Doc. 31.) On October 4,

10  2021, Respondent filed an answer. (Doc. 65.) On February 28, 2022, Petitioner filed a traverse.

11  (Doc. 72.)

12  **II.     FACTUAL BACKGROUND**[2]

13         At trial, it was stipulated that on January 23, 1997, Petitioner was convicted of committing

14  a lewd act on victim A.G., a child under the age of 14 years (Cal. Penal Code § 288, subd. (a));

15  and annoying or molesting victim T.H., a child under the age of 18 years (Cal. Penal Code §

16  647.6). At the time of the offenses in this case, Petitioner was on parole, he was a registered sex

17  offender, and he knew he was restricted from being with anyone under the age of 18 years.

18         A.      Petitioner and A.G. at the Apartment Complex (Count II)

19         On July 4, 2012, Lidia Dominguez lived in the same apartment complex as Petitioner. She

20  knew he was a registered sex offender. On that day, Dominquez saw Petitioner take a boy into

21  his apartment. Dominquez believed the boy was about 12 years old. The boy was smoking, and

22  Petitioner was carrying a bag with beverages. Dominquez reported the observation to the

23  apartment manager. The apartment manager called the police department.

24         On July 5, 2012, Fresno Police Officer Jose Jauregui received an email about Petitioner

25  being involved in a suspicious incident. Jauregui and Detective Shawn Bishop responded to the

---

[2] The facts are taken from the appellate court's Statement of Facts in its unpublished decision in People v. Bisel, 2016 WL 4211767, at *1–6 (Cal. Ct. App. 2016), insofar as the Fifth DCA's summary of facts is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

apartment complex and contacted the manager.  They knocked on Petitioner's apartment door, but no one answered.

As they waited at the apartment, Detective Bishop saw Petitioner drive into the complex with a boy in his car.  The officers went to the carport and approached Petitioner's parked car. The officers asked Petitioner to get out of the car and escorted him away from the boy, later identified as 16-year-old, A.G.

Officer Jauregui asked Petitioner about the boy.  Petitioner shouted, "[H]e's my nephew, he's my nephew."  Jauregui asked Petitioner to identify the boy's parents.  Petitioner did not immediately respond.  He then gave a woman's name and said she lived in Mendota.  Jauregui asked Petitioner about his relationship with the boy.  Petitioner said the boy was only visiting, and he was not staying with him.

Officer Jauregui testified Petitioner appeared to have been drinking.  He had bloodshot, watery eyes, and there was the odor of alcohol on his breath.  Jauregui tried to ask more questions, but Petitioner became uncooperative and would not answer.

Officer Jauregui interviewed A.G. at the scene, and advised him that a concerned citizen had seen them together the previous day.  He wanted to make sure A.G. was okay.[3]  Jauregui testified A.G. was quiet, upset, embarrassed, and reluctant to answer any questions.  A.G. told Jauregui that he met Petitioner two months earlier while he was hanging out in front of a drug store.  They became friends and were together about 10 times.  They went to lunch and drove around on these occasions.

Officer Jauregui testified that A.G. said Petitioner brought him to his apartment the previous day, July 4, 2012.  They had been driving around, and Petitioner said he needed to do his laundry.  A.G. said they were just "kicking back" that day and nothing sexual happened.  A.G.,

---

[3] Officer Jauregui revealed for the first time during his trial testimony that he tape-recorded his interview with A.G.; neither the prosecutor nor defense counsel knew about or had been given the recording prior to trial. Jauregui provided the recording to both parties that same day. Defense counsel subsequently used the tape to impeach portions of Jauregui's previous testimony about the length and certain portions of the interview. Defense counsel later moved for a mistrial because of the discovery violation. The court denied the mistrial motion but instructed the jury about the discovery violation. On appeal, Petitioner contends the court abused its discretion when it denied the mistrial motion.

however, also said that Petitioner tried to touch his crotch area, but A.G. hit his hand away.  A.G. said Petitioner offered money so he could touch him.  A.G. told Petitioner he would take the money, but Petitioner could not touch him anywhere because he didn't "roll the dice like that."

Officer Jauregui testified he asked A.G. what they were doing just before the officers contacted them at the apartment's carport.  A.G. said he had been trying to get to his mother's house in Mendota.  He was hanging out on the street and saw Petitioner, who offered him a ride.  A.G. got into the car, and Petitioner said he had to stop at his house first to do some chores.

### B.    A.G.'s Trial Testimony

At trial, A.G. testified he was living at a group home when he met Petitioner.  He was hanging out with friends at a drug store when Petitioner drove in the parking lot.  Petitioner said his name was "Gary."  A.G. testified he did not know Petitioner's real first name was "Gregory."  Petitioner asked A.G. to get in his car.  A.G. testified he could not remember if he got into Petitioner's car that day.  A.G. testified Petitioner bought him food.  A.G. went to Petitioner's apartment "at the most" twice.

A.G. testified that on July 5, 2012, he was hanging around the same drug store.  Petitioner drove by and they talked.  A.G. said he wanted to get to his mother's house in Mendota and he had missed the bus.  Petitioner offered to drive him to Mendota and A.G. accepted.  Petitioner said he had to stop by his apartment first and do the laundry.  A.G. got into the car.  A.G. testified he saw Petitioner drinking Bud Light beer in the car, and thought Petitioner was drunk because he could not handle the steering wheel.

A.G. testified that as Petitioner pulled into his apartment complex, Petitioner tried to touch A.G.'s crotch over his clothes.  A.G. testified he "whacked his hand away."  Petitioner offered money to A.G.  He believed Petitioner offered him money for sex: "... I was told by everyone I know that nobody just offers you money just for the heck of it."  A.G. refused the money and told Petitioner, "That's not how I roll the dice when I go to the casino."  A.G. wanted Petitioner to know that he liked girls.

A.G. testified the police stopped Petitioner's car shortly after Petitioner tried to touch him.  Petitioner told A.G. to say that he was Petitioner's 18-year-old nephew.  When Petitioner talked

1  to the police, he falsely claimed he was A.G.'s uncle.  Petitioner called out to A.G., "Tell them

2  that you're my 18-year-old nephew."

3       A.G. testified he spoke to the officers at the apartment complex and gave a statement.  He

4  told the police that Petitioner was lying about being his uncle.  A.G. learned Petitioner's true

5  name, and that he was a registered sex offender.

6       A.G. testified Petitioner offered money to him on more than one occasion.  These offers

7  occurred when A.G. was in Petitioner's car, but A.G. could not remember when the incidents

8  happened.  A.G. testified Petitioner offered him money to "do some kind of sexual actions and I

9  said, 'No, but I'll take your money, though.'"

10       C.       Petitioner and T.H. at the Mall (Count I)

11       The second incident charged against Petitioner occurred on August 5, 2012, at Sierra Vista

12  Mall in Clovis.  Tanya Romero (Romero) was working at "Hot Dog On A Stick," a fast food

13  restaurant at the mall.  She had been in the back of the store and returned to the front counter to

14  take a customer's order.

15       Petitioner was the customer who was waiting at the counter.[4]  Romero testified Petitioner

16  asked her what she had been doing.  Romero said she had been working in the back.  Petitioner

17  asked Romero if she had been smoking crack.  Romero testified Petitioner was rude and very

18  strange.  He seemed very angry and he made her uncomfortable.  Romero thought Petitioner

19  could have been drunk or intoxicated based on his movements, because he did not seem

20  completely aware of everything.

21       Romero did not reply to Petitioner's question about drugs and took his order.  Petitioner

22  bought a hot dog and sat at a table in front of the restaurant.

23       Around the same time, 14-year-old T.H. arrived at the mall.  T.H. sat at a table in front of

24  "Hot Dog On a Stick" and waited to meet some friends.

25       T.H. testified Petitioner moved from his table and sat at T.H.'s table.  Petitioner asked

26  T.H. if he wanted to be his friend.  T.H. testified he did not know Petitioner and thought he might

27
_____

28  [4] The record reflects that Petitioner was not taken into custody during the investigation into the incident
with A.G. on July 5, 2012.

1   be mentally unstable.  T.H. replied, "[S]ure," because he did not want to be rude.

2        T.H. testified Petitioner got up from the table. Petitioner told T.H.: "Come on, let's go."

3   T.H. refused and said he was waiting for his friends.  T.H. testified he was uncomfortable with

4   Petitioner, and afraid that he wanted to kidnap or sexually assault him.  T.H. testified Petitioner

5   became flustered and angry when T.H. refused to go with him.  Petitioner again sat down at

6   T.H.'s table and asked him, "Well, do you not want to be with me?"  T.H. said, "It's not that I

7   don't want to be with you. It's that I'm waiting for my friends." Petitioner replied, "Well, then,

8   what the f[**]k?"

9        T.H. testified Petitioner calmed down.  Petitioner produced a pen and paper, and asked

10   T.H. for his name and telephone number.  T.H. wrote down a fake name and number, and

11   identified himself as "Lucas."  Petitioner took the paper and left.

12        Romero, the restaurant employee, had watched the encounter between Petitioner and T.H.

13   Romero was concerned that Petitioner was talking to a young boy, and believed T.H. looked very

14   uncomfortable.  Romero testified Petitioner had been rude to her, but he acted "sort of too nice"

15   to T.H.  Romero called mall security while Petitioner was still talking to T.H.  After Petitioner

16   left, Romero told T.H. that she had seen the incident and called security.  Romero testified the

17   mall's security guards followed Petitioner as he left the area.

18        Clovis Police Officer Dave Roseno responded to the call from the mall's security guards

19   about a suspicious older male talking to a young male.  The security guards advised dispatch

20   about Petitioner's location in the parking lot.  Roseno followed their directions and contacted

21   Petitioner in the parking lot.

22        Officer Roseno testified Petitioner smelled like alcohol and acted incoherent, but he was

23   not under the influence.  Petitioner was belligerent and refused to answer Roseno's questions.

24   Petitioner acted like he had a hard time pulling out his identification from his pocket.  Roseno

25   believed Petitioner "was playing some sort of game with me."  Roseno placed Petitioner in

26   handcuffs and in his patrol car for safety reasons.

27        Officer Roseno went into the mall and spoke with T.H.  Roseno then returned to the

28   parking lot and searched Petitioner's car.  He found one empty 24-ounce can of Bud Light, and

two closed Bud Lights, which were cold to the touch.  A roll of industrial-strength packing tape was in the trunk.  Roseno searched Petitioner and found the paper with the name "Lucas" and a telephone number.

Officer Roseno asked Petitioner about Lucas and what happened in the mall.  Petitioner said he did not know what Roseno was talking about.  Petitioner denied that anything inappropriate happened inside the mall.

### D.    Petitioner's Trial Testimony

#### 1.    A.G. (Count II)

Petitioner testified he did not engage in any inappropriate conduct with T.H. or A.G.  He described A.G. as "a local urchin" who sat at the street corner, wore ragged clothes, asked for change, and said he was hungry.  Petitioner gave him a few dollars for food.  Petitioner regularly saw A.G. at the same corner.  He seemed like "a pretty nice kid."  Petitioner took him to fast food restaurants, and A.G. thought "I was Daddy Warbucks."

Petitioner testified he took A.G. with him on errands because A.G. wanted to spend time with him.  Petitioner took A.G. to his apartment twice when he had to do chores.  There was no sexual activity between them.  Petitioner testified he was not sexually attracted to A.G., and he never tried to grab A.G.'s body in any way.  Petitioner never offered money for sex and only gave him money for food.

Petitioner testified that on July 5, 2012, he was driving by A.G.'s regular corner and A.G. flagged him down.  A.G. said he needed a ride to Mendota, and Petitioner agreed to take him to another bus stop where he could get on the right bus.  Petitioner first went to his apartment to do the laundry, and the police were there.

Petitioner admitted he falsely told the police that A.G. was his 18-year-old nephew.  He made the statement in a loud voice so A.G. would hear him.  Petitioner knew he was on parole "for a nonsexual crime," and he was restricted from being with anyone under the age of 18 years.  A.G. had told Petitioner that he was 16 years old.  Petitioner admitted it was not smart for him to hang out with a teenager, and he was worried his parole agent would find out.

1          2.      T.H. (Count I)

2          Petitioner also testified about the mall incident with T.H.  He went to the mall to see a

3    movie by himself.  He had been drinking beer that day.  He went to the hot dog stand to get

4    something to eat, but the employee was not there.  He was annoyed that he had to wait.  When the

5    clerk finally appeared at the counter, Petitioner asked if she had been smoking pot because he

6    knew of an incident where the staff had done that at another fast food restaurant.  Petitioner

7    testified he might have acted a little "authoritarian" when he spoke to the clerk, and he wanted to

8    "harass her, as an authoritarian with fast-food experience" because he used to work at fast food

9    restaurants.

10         Petitioner testified he noticed a teenage boy, later identified as T.H., who was sitting at a

11   nearby table.  He did not know T.H. but described him as "probably a local mall rat."  T.H. was

12   looking at the female restaurant clerk.  Petitioner thought T.H. might have a crush on her.

13   Petitioner testified he decided to talk to T.H. because Petitioner was "gregarious" and "a

14   busybody sometimes."  Petitioner intended to "find out about what's the deal with this girl ... who

15   won't wait on her customers, what's her attitude all about and all that."

16         Petitioner testified he sat down with T.H. and was surprised that the boy looked sad.

17   Petitioner asked him about the restaurant clerk.  Petitioner admitted he was intoxicated at the

18   time.  Petitioner denied having any sexual interest in T.H.  He might have asked T.H. if he wanted

19   to be his friend, but did not ask T.H. to leave with him.  Petitioner asked for the boy's telephone

20   number because he thought T.H. wanted to talk to someone.  Petitioner wanted to help him

21   because "I'm a big helper."  Petitioner gave him a card and a pen.  T.H. wrote something and

22   gave the card back to him.  Petitioner told T.H. that he might call him sometime.

23         Petitioner testified he walked away and did not know that he was being followed by mall

24   security.  He felt intoxicated.  He went into the parking lot and walked around, and the police

25   stopped him.

26         Petitioner testified he did not exercise very good judgment on both occasions with T.H.

27   and A.G. because he had consumed alcohol, which resulted in poor decision making.  Petitioner

28   admitted he did not learn his lesson between the two incidents on July 5, and August 5, 2012.

1       E.       Petitioner's Prior Convictions

2               Petitioner testified he had prior convictions in 1997 that were the result of plea bargains

3       and not a jury trial.  Petitioner admitted both victims in the prior convictions were teenage boys,

4       but he denied having any sexual interest in teenage boys.  Petitioner also admitted he intended to

5       "help" one of the teenage victims in the prior case, and he was convicted of committing a sexual

6       act against him.

7               Petitioner admitted that as part of one prior conviction, he was accused of lying in bed,

8       under the covers with a young boy, while rubbing his back with his pants down.  He was also

9       accused of touching a young boy's penis and rubbing his buttocks.  Petitioner denied committing

10      such acts but admitted he entered into a plea bargain for the charges.

11              Petitioner admitted he wrote a "love" letter to a 16-year-old boy in 1994, and said that he

12      loved the boy more than he loved himself.  Petitioner denied having a romantic relationship with

13      the boy, and claimed he "loved" him as part of loving the boy's entire family.

14      F.       Charges, Verdict, and Sentence

15              On August 5, 2012, Petitioner was arrested after the incident at the mall. Petitioner

16      remained in custody for the entirety of the proceedings. Deputy Public Defender Scott Baly was

17      appointed to represent Petitioner.

18              On May 23, 2013, Petitioner made a motion pursuant to People v. Marsden, 2 Cal.3d 118

19      (1970) to discharge Mr. Baly, but subsequently withdrew the motion.  On July 9, 2013, the court

20      granted Petitioner's motion to represent himself pursuant to Faretta v. California, 422 U.S. 806

21      (1975), immediately prior to the preliminary hearing.  On February 18, 2014, Petitioner requested

22      reappointment of counsel.  The court granted the motion and Mr. Baly resumed representation of

23      Petitioner throughout the remainder of the criminal proceedings.

24              On April 1, 2014, Petitioner's jury trial began.  On April 10, 2014, Petitioner was

25      convicted as charged of counts I and II, annoying or molesting a child under the age of 18 with

26      two prior felony convictions based on, respectively, the encounters with T.H. and A.G.  The court

27      found the prior conviction allegations true, that he had one prior strike conviction and served two

28      prior prison terms.

9

1  **III.   DISCUSSION**

2      A.   Jurisdiction

3      Relief by way of a petition for writ of habeas corpus extends to a person in custody

4  pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

5  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6  529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

7  guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno

8  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

9  2254(a); 28 U.S.C.§ 2241(d).

10      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

11  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

13  filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

14  and is therefore governed by its provisions.

15      B.   Legal Standard of Review

16      A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

17  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

18  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

19  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

20  based on an unreasonable determination of the facts in light of the evidence presented in the State

21  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

22  Williams, 529 U.S. at 412-413.

23      A state court decision is "contrary to" clearly established federal law "if it applies a rule

24  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

25  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

26  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

27  406).

28      In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, ___ U.S. ___, ___ , 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___, ___, 137 S.Ct. 1726, 1728 (2017) (per curiam)). Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3. Congress "meant" this standard to be "difficult to meet." Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error

1  had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

2  <u>Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007)

3  (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

4  reviewed it for harmlessness).

5        C.      <u>Review of Petition</u>

6        Petitioner raises the following claims in his petition: 1) Petitioner claims a violation of his

7  speedy trial rights, and ineffective assistance of counsel for failing to request dismissal for time

8  provisions; 2) Ineffective assistance of counsel for failure to obtain transcript of police interview;

9  3) Late discovery of officer's taped interview with victim was prejudicial and violated

10  Petitioner's constitutional rights, and ineffective assistance of counsel for failing to obtain

11  transcript of recording; 4) Ineffective assistance of counsel for failure to convey terms of a four-

12  year plea offer; 5) Ineffective assistance of counsel as to jury instructions; and 6) Ineffective

13  assistance of appellate counsel.

14        1.      <u>Speedy Trial Rights</u>

15        In his first claim for relief, to the extent it can be understood, Petitioner claims that certain

16  state time provisions were not adhered to in violation of his right to speedy trial.  He claims

17  defense counsel was ineffective in failing to object to those violations of time provisions and for

18  failure to request dismissal as a result.  He further claims the trial court violated his rights by

19  ignoring his motions and forcing him to forego self-representation and instead rely on ineffective

20  defense counsel.

21        Petitioner raised these claims in a habeas petition to the California Supreme Court. (Doc.

22  43-13.)  The California Supreme Court denied the claims as successive with the following ruling:

23        The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th
         750, 767-769 [courts will not entertain habeas corpus claims that are successive].)

24

25  <u>People v. Bisel</u>, Case No. S253940[5] (Cal. 2019).

26

27  _____

28  [5]https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=2278199&doc_no=S253940&reque
   st_token=NiIwLSEmPkw7WyBFSCJdUEpIQFg0UDxTJiIuIz5TMCAgCg%3D%3D

1           *a.*      *Procedural Default*

2           Respondent alleges the California Supreme Court's procedural ruling bars the claims in

3 federal court.  Respondent is correct.

4           State courts may decline to review a claim based on a procedural default. <u>Wainwright v.</u>

5 <u>Sykes</u>, 433 U.S. 72, 86–87 (1977).  In turn, federal courts "will not review a question of federal

6 law decided by a state court if the decision of that court rests on a state law ground that is

7 independent of the federal question and adequate to support the judgment." <u>Coleman v.</u>

8 <u>Thompson</u>, 501 U.S. 722, 729 (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001);

9 <u>see</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1150

10 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner

11 has defaulted on the particular state's procedural requirements . . . .").  This concept has been

12 commonly referred to as the procedural default doctrine.  This doctrine of procedural default is

13 based on concerns of comity and federalism.  <u>Coleman</u>, 501 U.S. at 730-32.  If the court finds an

14 independent and adequate state procedural ground, "federal habeas review is barred unless the

15 prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate

16 that the failure to consider the claims will result in a fundamental miscarriage of justice." <u>Noltie</u>

17 <u>v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir. 1993); <u>Coleman</u>, 501 U.S. at 750; <u>Park</u>, 202 F.3d at

18 1150.

19           The mere occurrence, however, of a procedural default will not necessarily bar a federal

20 court from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural

21 default doctrine to apply and thereby bar federal review, the state court determination of default

22 must be grounded in state law that is both adequate to support the judgment and independent of

23 federal law.  <u>Ylst</u>, 501 U.S. at 801; <u>Coleman</u>, 501 U.S. at 729-30.  Put another way, the

24 procedural default doctrine will apply only if the application of the state procedural rule provides

25 "an adequate and independent state law basis" on which the state court can deny relief.  <u>Park</u>, 202

26 F.3d at 1151 (quoting <u>Coleman</u>, 501 U.S. at 729-30).

27           "For a state procedural rule to be 'independent,' the state law basis for the decision must

28 not be interwoven with federal law." <u>LaCrosse</u>, 244 F.3d at 704 (citing <u>Michigan v. Long</u>, 463

1   U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal

2   habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or

3   to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at 735). "A state law is so

4   interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling

5   on federal law [such as] the determination of whether federal constitutional error has been

6   committed.'" Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

7          To be deemed adequate, the state law ground for decision must be well-established and

8   consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural

9   rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly

10  followed' at the time it was applied by the state court.") (quoting Ford v. Georgia, 498 U.S. 411,

11  424 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a

12  rule inadequate, the discretion must entail "'the exercise of judgment according to standards that,

13  at least over time, can become known and understood within reasonable operating limits.'" Id. at

14  377 (quoting Morales, 85 F.3d at 1392).

15         The superior court's rejection of this claim as successive under In re Clark constituted an

16  adequate and independent state ground barring federal review. See In re Robbins, 18 Cal.4th 770,

17  788 n. 9, 811 (1998).  Petitioner fails to demonstrate cause and prejudice, or that a fundamental

18  miscarriage of justice would occur if the claim were not considered.  Therefore, federal review is

19  barred. Coleman v. Thompson, 501 U.S. 722, 749-50 (1991).  Notwithstanding the procedural

20  bar, as discussed below, the claims are meritless.

21                    b.      Analysis – Speedy Trial Rights

22         Petitioner alleges that on February 5, 2013, and again on July 8, 2013, he did not waive

23  time for the preliminary hearing.  (Doc. 31 at 92-93.)  He contends the case should have been

24  dismissed.  Respondent correctly responds that the claims are unsupported by the record, and in

25  any event, do not amount to a constitutional violation.

26         First, the record shows that a general time waiver was in effect on the hearing date of

27  February 5, 2013. (Doc. 75-1 at 25.)  Petitioner had entered the general time waiver on August

28  14, 2012, (Doc. 75-1 at 13), and did not withdraw it until May 9, 2013. (Doc. 75-1 at 39.)  There

1  is no support for the argument that Petitioner withdrew the time waiver on February 5, 2013.

2  The record also shows Petitioner agreed to continue the hearing held on July 8, 2013.

3  (Doc. 75-1 at 52; Doc. 43-14 at 45.)  Petitioner had moved to represent himself pursuant to

4  Faretta, and the court advised Petitioner that the motion would require additional time, possibly

5  two or three days, to provide Petitioner with the appropriate paperwork, and to provide the court

6  with an opportunity to review the request. (Doc. 43-14 at 42-45.)  The court indicated that the

7  case could proceed that day and that his attorney had indicated he was ready to proceed, but if he

8  insisted on pursuing the Faretta motion, the hearing would have to be continued. (Doc. 43-14 at

9  42-45.)  Petitioner agreed to continue the hearing. (Doc. 43-14 at 45.)  Thus, Respondent is

10  correct that Petitioner's argument is belied by the record.

11  Even if Petitioner's assertions were true, they do not rise to a constitutional violation.  In

12  Barker v. Wingo, 407 U.S. 514, 531-33 (1972), the Supreme Court enunciated the factors to be

13  considered in determining whether the Sixth Amendment right to a speedy trial has been denied:

14  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right;

15  and (4) the prejudice resulting from the delay.  Petitioner claims that the five-month period

16  between February 5, 2013, and July 9, 2013, was unconstitutional.  However, the Ninth Circuit

17  has stated that a delay of "less than five months . . . . cannot be considered 'presumptively

18  prejudicial' so as to even trigger the balancing and require and examination of the other three

19  factors."  United States v. Nance, 666 F.2d 353, 360-61 (9th Cir. 1982) (citing United States v.

20  Diaz-Alvarado, 587 F.2d 1002, 1005 (9th Cir. 1978), cert. denied, 440 U.S. 927 (1979) (five

21  month delay insufficient in itself to show violation of right)).  In fact, the Ninth Circuit noted that

22  there is a "general consensus among the courts of appeals that eight months constitutes the

23  threshold minimum."  United States v. Gregory, 322 F.3d 1157, 1162 n.3 (9th Cir. 2003).

24  Therefore, the alleged five-month delay here was not a violation of Petitioner's Sixth Amendment

25  speedy trial rights.

26  With respect to Petitioner's claims that California's statutory time limits were violated, the

27  claim is not cognizable.  Federal habeas relief is only available if a petitioner alleges he is in

28  custody in violation of the Constitution or laws or treaties of the United States.  Estelle v.

15

1   McGuire, 502 U.S. 62, 67-68 (1991).

2        In the alternative, Petitioner alleges defense counsel was ineffective in failing to object or

3   file a motion to dismiss the proceedings due to the alleged time violations.  However, as

4   discussed above, the record shows that Petitioner agreed to continue the proceedings, and his

5   contentions lack support.  Thus, he cannot establish that counsel erred, or that he was prejudiced

6   from the alleged error.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

7            c.    Analysis – Allegation of Forced Relinquishment of Right to Self-
                   Representation
8

9        Petitioner further claims the trial court's decisions concerning his motions for continuance

10  caused him to relinquish his right to self-represention.  He alleges the trial court's actions

11  included: 1) repeated threats to imminently empanel a jury; 2) providing no guidance or inquiry

12  into a four-year plea offer; 3) failing to inquire into his motion for transcript; 4) failing to inquire

13  into his motion for transcript of the 9-1-1 call; 5) failing to appoint advisory counsel to obtain law

14  library privileges; and 6) professing ignorance of jail's law library access procedures. (Doc. 43-14

15  at 23-24.)

16       Petitioner's case was set for trial to commence on February 18, 2014. (Doc. 75-6 at 4.) On

17  that date, Petitioner, representing himself, requested a continuance.  (Doc. 75-6 at 4-18.)

18  Petitioner stated he had received some discovery, but he was working on a motion to dismiss and

19  a motion for transcript of a 9-1-1 call. (Doc. 75-6 at 11-16.)  The prosecutor responded Petitioner

20  had been given all discovery on August 27, 2013. (Doc. 75-6 at 18.)  The court denied the motion

21  to continue. (Doc. 75-6 at 21.)  After the ruling, Petitioner requested the appointment of counsel.

22  (Doc. 75-6 at 21-22.)

23       After a recess, the court addressed Petitioner's motion.  (Doc. 75-6 at 25.)  The court

24  stated it was not inclined to appoint advisory or standby counsel, but would be inclined to appoint

25  counsel. (Doc. 75-6 at 27.)  Petitioner responded he would like to have counsel, specifically his

26  prior attorney Scott Baly, appointed as his defense counsel. (Doc. 75-6 at 28.)  Petitioner also

27  requested law library access, but the Court stated it could not interfere or order it, but the court

28  assumed Petitioner had some access as a prisoner. (Doc. 75-6 at 28.)  The court then reappointed

1   counsel. (Doc. 75-6 at 32-35.)

2       In <u>Faretta v. California</u>, 422 U.S. 806, 834-35 (1975), the Supreme Court held that the

3   right to a defense under the Sixth Amendment includes the right to choose self-representation and

4   forego representation by counsel.  The defendant "must 'knowingly and intelligently' forego" his

5   right to counsel. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464-65 (1938).  Nevertheless, the Supreme

6   Court noted that "the right of self-representation is not a license to abuse the dignity of the

7   courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive

8   law." <u>Faretta</u>, 422 U.S. at 834 n. 46.  In addition, the Constitution does not "require judges to

9   take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a

10  matter of course.  <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 184 (1984).  Further, a trial judge may

11  terminate self-representation by a defendant who deliberately engages in serious and

12  obstructionist misconduct. <u>Id.</u> (citing <u>Illinois v. Allen</u>, 397 U.S. 337 (1970)).  Once a defendant

13  chooses self-representation, he may thereafter waive his right to self-representation.  <u>McKaskle</u>,

14  465 U.S. at 183; <u>see also</u> <u>Sandoval v. Calderon</u>, 241 F.3d 765, 774–775 (9th Cir. 2001) ("Where

15  circumstances indicate that the defendant has changed his or her mind about self-representation"

16  there is no requirement "that [he] ... be cautioned or addressed before receiving the assistance of

17  counsel.").

18      Here, as correctly noted by Respondent, most of Petitioner's requests concerning

19  continuance were not based on the need for more time to prepare for trial.  Instead, Petitioner

20  sought additional time to prepare motions to avoid going to trial. For example, Petitioner's

21  motion to dismiss and his motion for transcript had nothing to do with trial preparation.

22  Likewise, Petitioner's arguments over the plea offer had no bearing on trial readiness.  As to

23  Petitioner's discovery requests, the prosecution stated Petitioner had been provided all discovery

24  nearly six months earlier on August 27, 2013. (Doc. 75-6 at 18).  Thus, Petitioner offered no

25  reason for a continuance to prepare for trial.

26      Petitioner also faulted the trial court for professing ignorance of his law library access, and

27  declining to order further access.  However, the trial court did not profess ignorance; the trial

28  court instead stated that was not in its purview, and assumed petitioner as a prisoner had some

access.  (Doc. 75-6 at 28.)  Furthermore, this concern was made known only *after* Petitioner

requested appointment of counsel. (Doc. 75-6 at 28-29.)  In addition, once counsel was appointed,

his right to access was satisfied. United States v. Wilson, 690 F.2d 1267, 1272 (9th Cir. 1982)

("the offer of court-appointed counsel to represent [a defendant] satisfie[s] the Fifth Amendment

obligation to provide meaningful access to the courts).

Thus, Petitioner provided no valid reason for continuing the trial.  The trial court reviewed

all of Petitioner's concerns thoroughly as they related to trial readiness, and reasonably denied the

continuance.  There is no basis for Petitioner's contention that the denial of the continuance in

any way forced him to give up his right to self-representation.  The claim should be rejected.

2.    Late Discovery

In his third[6] ground for relief, Petitioner contends that the late discovery of an officer's

taped interview with the victim prejudicially violated his constitutional rights.  This claim was

raised on direct appeal in the state courts.  In the last reasoned decision, the Fifth DCA rejected

the claim as follows:

I. Denial of Defendant's Motion for Mistrial

As set forth above, Officer Jauregui testified on direct examination about his
interview with A.G. at defendant's apartment complex. On cross-examination,
Jauregui revealed for the first time that he had recorded his interview with A.G.;
he failed to mention the recording in his report; he failed to turn it over to the
prosecutor; and he still had the recording in his possession. Neither the prosecutor
nor defense counsel knew about the recording. Jauregui provided the recording to
the parties later that day. Defense counsel later used the recording to impeach
portions of Jauregui's previous testimony about A.G.'s statements. Defendant
subsequently moved for a mistrial and argued he did not have sufficient time to
prepare a transcript that he could have used for impeachment. The court denied the
motion but instructed the jury about the belated discovery.

On appeal, defendant contends the court abused its discretion when it denied his
motion for mistrial because of the discovery violation. Defendant argues the
belated disclosure of the recording violated his federal due process rights to a fair
trial, present a defense, and confront and cross-examine both Officer Jauregui and
A.G. about the charges against him. Defendant acknowledges that the recording
was provided to his attorney in the midst of trial, but asserts the discovery
violation was prejudicial because counsel did not have sufficient time to have the
interview transcribed and play the recording to the jury.

---

[6] Petitioner's second ground for relief will be addressed along with his fourth and fifth grounds as they
each involve claims of ineffective assistance of counsel.

18

As we will explain, the court did not abuse its discretion when it denied defendant's motion for mistrial because the belated disclosure did not result in prejudice.

### A. Discovery

We begin with the People's "constitutional and [ ] statutory duty to disclose information to the defense. [Citations.] The constitutional duty arises under the due process clause of the United States Constitution and requires the prosecution to disclose any material evidence exculpatory of the defendant irrespective of the good faith or bad faith of the prosecutor. [Citations.]" (*People v. Bowles* (2011) 198 Cal.App.4th 318, 325 (*Bowles*), citing *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*).) [Fn.5]

> [Fn.5] The People contend that defendant has not argued that the belated disclosure of the tape violated *Brady*. On appeal, however, defendant has renewed the argument he made at trial, that the belated disclosure violated both his federal due process rights to a fair trial and to present a defense, and the statutory reciprocal discovery provisions.

"There are three components of a *Brady* violation: (1) the evidence must be favorable to the accused, meaning it is exculpatory, or impeaching; (2) the evidence must have been willfully or inadvertently suppressed by the State; and (3) prejudice must have ensued because the evidence was material to the issue of guilt and innocence of the accused by establishing a reasonable probability of a different result. [Citation.]" (*Bowles, supra*, 198 Cal.App.4th at p. 325.)

"The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)

"The California statutory discovery scheme (§ 1054 et seq.) requires that the prosecution disclose specified information to the defense, including any 'exculpatory evidence,' .... [Citations.] Absent good cause, such evidence must be disclosed at least 30 days prior to trial, or immediately if discovered or obtained within 30 days of trial. [Citation.]" (*Bowles, supra*, 198 Cal.App.4th at p. 325.) Exculpatory evidence for purposes of the statute includes significant impeachment evidence. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1164.)

The statutory duty to disclose extends to information "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (§ 1054.1.) This has been interpreted to mean that materials not literally in the prosecution's hands but "'reasonably accessible'" through investigating agencies must be produced. (*In re Littlefield* (1993) 5 Cal.4th 122, 135.) "Section 1054.1 concisely lists six specific items that the prosecution must disclose to the defendant or his or her attorney, and, consistent with the stated purposes of discovery provisions of [section 1054 et seq.], the prosecution has a duty to inquire in order to satisfy these requirements." (*People v. Little* (1997) 59 Cal.App.4th 426, 432–433.) One of these statutorily-defined items includes "[r]elevant written or *recorded statements* of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the

trial ....” (§ 1054.1, subd. (f), italics added.)

“The trial court has broad discretion to fashion a remedy in the event of a discovery abuse to ensure that the defendant receives a fair trial. [Citation.] The trial court may enforce the discovery statutes by ordering ‘immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.’ [Citation.] If these sanctions have been exhausted, the trial court may also prohibit the testimony of a witness. [Citation.] Finally, if required to do so by the Constitution of the United States, the trial court can dismiss a charge. [Citation.]” (*Bowles, supra*, 198 Cal.App.4th at pp. 325–326.)

A ruling on a motion for mistrial is reviewed for an abuse of discretion, as is the determination of what, if any, remedy is required for a discovery violation. (*People v. Ayala* (2000) 23 Cal.4th 225, 282; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 792.)

With these standards in mind, we turn to the procedural background of the belated disclosure of Officer Jauregui's tape-recorded interview with A.G., defense counsel's use of that recording during trial, and defendant's motion for mistrial.

B. A.G.'s Trial Testimony

On April 1, 2014, defendant's jury trial began. He was represented by Mr. Baly, a deputy public defender.

On April 3, 2014, A.G. testified as a prosecution witness, as set forth above. The prosecutor asked A.G. on direct examination if he made certain statements to the police about the details of his visits to defendant's apartment. A.G. said he did not recall what he told the police about his prior visits to the apartment.

On cross-examination, defense counsel asked A.G. if he read over police reports before he testified to refresh his recollection. A.G. said no. Defense counsel asked A.G. if he “read anything out in the hall.” A.G. said: “A little bit, but I don't remember it. It's just mainly what was in my head that I had told you – told him actually [referring to the prosecutor].” On further cross-examination, A.G. testified the district attorney's investigator had shown him a piece of paper before he testified “about the police report and about all the details and stuff like that.”

Defense counsel asked A.G. for details about when defendant offered him money for sex. A.G. said he could barely remember what happened because “my brain is like cloudy sometimes. I can't remember all the things at once. I try to, but I can't.” Defense counsel asked A.G. if he had a problem with his memory. A.G. said he sometimes thought so, and “[t]hat's why I had to look over that paper real quick, but it helped a little bit, but like it just comes in pieces, though, because the way I was looking at it it just came late some of it and some of it came early to my head.”

Defense counsel asked A.G. how much of his testimony was based on his memory as opposed to what he read “on paper” in the hallway that morning. A.G. said “[p]robably like half of it. But just because ... that I don't remember it, though, doesn't mean it didn't happen.”

A.G. was excused subject to recall.

20

### C. Officer Jauregui Testifies About the Recording

On Friday, April 4, 2014, Officer Jauregui testified as a prosecution witness about his investigation into defendant's contact with A.G. Jauregui testified he interviewed A.G. at defendant's apartment complex, and the interview lasted 40 to 45 minutes.

During cross-examination, Officer Jauregui again testified he spoke to A.G. for about 45 minutes. Jauregui also revealed for the first time that he tape-recorded his interview with A.G.

"[DEFENSE COUNSEL]: Where in your report did you document that you tape-recorded the interview with [A.G.]?

"A. I did not, sir.

"Q. Do you have that tape-recording?

"A. I believe I still do. [¶] ... [¶]

"Q. When you take a recorded statement from a minor in a sexual assault case, do you typically book the interview recorded into evidence.

"A. I believe so, yes.

"Q. In your interview in this case, did you book it into evidence?

"A. I don't recall, sir.

"Q. Do you know where it is?

"A. What, the recording?

"Q. Yes.

"A. I believe I still have it, yes."

Officer Jauregui testified the tape recording was in his office.

The court had a side-bar conference with the parties, and then continued with another witness. After that, the court released the jury for the weekend.

### D. Discussions About the Recording

After the jury was excused, the court asked the parties to address Officer Jauregui's revelation about the recording of his interview with A.G. Mr. Baly, defense counsel, said the tape recording was newly discovered evidence. He wanted to listen to the tape recording and then he would make certain motions. The court agreed and called a recess until Monday morning.

It is undisputed by the parties that Officer Jauregui retrieved the tape recording of A.G.'s interview that Friday afternoon, and it was provided to both the prosecution and defense.

### E. Cross-Examination of Officer Jauregui About the Recording

On Monday morning, April 7, 2014, the court reconvened and defense counsel recalled Officer Jauregui to the stand.

Defense counsel asked Officer Jauregui about what happened on Friday afternoon after he disclosed the existence of the tape recording of A.G.'s interview. Jauregui testified the prosecutor and defense counsel asked him to go to his office and get it. Jauregui drove to his office and determined the recording was "on an audio recorder," a small portable device that was in his desk drawer. The interview was saved as a file. He plugged the recorder into the computer and retrieved the recording of the interview. He provided the audio recorder to the prosecutor's investigator, who produced CDs of the recorded interview for both parties.

Defense counsel did not play the recorded interview in the jury's presence. Instead, he asked Officer Jauregui to listen to certain portions of the interview with headphones, and then questioned Jauregui about conflicts between his previous trial testimony and A.G.'s recorded statements.

Officer Jauregui testified he did not tell A.G. that he was recording the interview. Defense counsel reminded Jauregui that he previously testified that his interview with A.G. lasted 45 minutes. Jauregui conceded the tape recording of the interview was only 15 minutes, and he had mistakenly given a round approximation. Jauregui agreed that he previously testified that A.G. said he only knew defendant as "Gary." The recorded interview revealed that A.G. said "he knew [defendant] as Gary but his name was Gregory but he should be called Gary," and this statement was not in his report.

Defense counsel asked Officer Jauregui if he repeatedly asked A.G. whether he was a runaway from a group home. Jauregui testified A.G. said he was on a permitted leave, and Jauregui told A.G. that he would find out the truth if he was a runaway. Jauregui could not recall if A.G. was frightened, or if Jauregui told A.G. that he was "no rookie cop," and he was going to call his mother. Defense counsel asked Jauregui to listen to another portion of the taped interview through his headphones. After listening, Jauregui agreed that he told A.G. that he was not a rookie cop, and that he had been around for a while.

Officer Jauregui testified he asked A.G. if defendant asked him to do anything, and if he touched A.G. A.G. initially said no. Defense counsel asked Jauregui if A.G. became emotional, and if he asked to search A.G.'s backpack. Jauregui said he could not remember. Defense counsel asked Jauregui to listen to another portion of the recording on his headphones. After doing so, Jauregui testified he asked A.G. to show him what was in his backpack, and A.G. opened it for him. Jauregui also testified A.G. was tearing up and emotional while he looked through the backpack.

Defense counsel asked Officer Jauregui if A.G. wanted to know whether "he" was going to jail. Jauregui testified his interpretation of A.G.'s question was that A.G. asked if defendant was going to jail, and Jauregui told him not to worry about that.

In response to further cross-examination about the recording, Officer Jauregui testified that at the end of the recorded interview, A.G. said defendant tried to touch his private area, and he slapped his hand away. Jauregui asked A.G. how it happened. A.G. said he could not remember, but he slapped defendant's hand away. A.G. said defendant bought him food, but did not give him alcohol or drugs.

Officer Jauregui was excused subject to recall. The prosecution continued with its witnesses about the mall incident with T.H.

Officer Jauregui's tape-recorded interview with A.G. was not played for the jury or marked for evidence.

### F. Motion for Mistrial

After the prosecution rested, defense counsel moved for a mistrial based on the late discovery and disclosure of Officer Jauregui's recorded interview with A.G. Defense counsel complained the recording should have been booked into evidence and provided to the defense during the initial discovery period. Defense counsel reminded the court that he initially represented defendant until the court granted defendant's *Faretta* motion. Defense counsel further stated that defendant made an informal motion for discovery when he represented himself. When Mr. Baly was reappointed to represent defendant, he sent an e-mail to the prosecution to ensure he had received all discovery. He did not receive the tape recording. Instead, the recording was "secreted and hidden from counsel" where it could not be found, and it was not mentioned in Jauregui's report.

Defense counsel argued the prosecution's failure to turn over the recording violated defendant's rights to due process, equal protection and a fair trial. The delayed discovery lasted for over one year, and included the period where defendant represented himself while in custody. The belated disclosure of the recording was prejudicial and a mistrial should be granted.

The prosecutor conceded there was an obligation to turn over the recording, but stated that he did not learn about the existence of the recording until Officer Jauregui testified, which was the same time that defense counsel heard about it. The prosecutor confirmed that defense counsel sent an e-mail for informal discovery on March 26, 2014, just before trial started, and the tape recording was turned over on April 4, 2014. The prosecutor argued sanctions could not be imposed unless a 15-day period had been violated after a formal discovery motion. The prosecutor also argued the defense had the weekend to review the tape recording, and the interview was incriminating against defendant.

Defense counsel replied the delayed discovery was prejudicial because there were inconsistencies between Officer Jauregui's report and the recording, and there was no time to prepare a transcript. Defense counsel argued:

> "Without the benefit of a specific transcript, we've tried to accommodate refreshing [Officer Jauregui's] memory by the use of headphones in the courtroom during cross-examination.

> "Also, taking a substantial break where the officer listened to the entire interview again to refresh his memory is not as good as having a transcript. A transcript for a 15-minute interview is not easy to produce. Normally the Rules of Court would require that the transcript be provided weeks before trial to be shared and agreed upon between parties before the trial.

> "There are disagreements of the statements made in this recording that are left only to be the disagreement of opinion as to whether or not [A.G.] made certain statements. And under the circumstances, that's the best I can do.

"This statement should have been provided early on. It should have been identified in the police report. It should have been booked into evidence, which would have been the appropriate departmental procedure to follow. I don't think there's any denial of that. I don't think there's any question that it's inappropriate for an officer to record a statement of a witness and then not to book it, instead to keep it in his desk drawer where, at the last minute in trial, he comes up with it at the last minute.

"This has made defending [defendant], as it relates to the statement, more difficult. And that's the prejudice that I think exists in this case."

### G. The Court's Denial of the Motion for Mistrial

The court accepted defendant's representation that he made an informal discovery request when he represented himself. The court rejected the prosecutor's statement that sanctions could not be imposed without a formal discovery motion.

The court found there was no prosecutorial misconduct and agreed that the prosecutor and defense counsel learned about the tape recording for the first time when Officer Jauregui testified the previous Friday: "I think the look on [the prosecutor's] face was probably as shocking as the look on [defense counsel's] face," when Jauregui testified about the recording. [Fn.6]

[Fn.6] On appeal, defendant has not raised any claims of prosecutorial misconduct or challenged the trial court's finding that the prosecutor did not know about the recording's existence until Officer Jauregui revealed the information during his testimony. (*See*, *e.g.*, *People v. Gatlin* (1989) 209 Cal.App.3d 31, 38.)

The court denied defendant's motion for mistrial:

"This was a police officer error, an oversight. No different than officers that generally will destroy their notes after they've made their report, this officer probably forgot to destroy the tape. I don't know that anybody asked him specifically previously; he certainly didn't volunteer it or check it into evidence. And everything [defense counsel] said is correct. Absolutely everything was correct. It should have been booked into evidence. I think because it was an oversight, and not only wasn't booked into evidence but probably forgotten about on the recorder because there was some problems recovering it, I think that that's why it was never told to the People. And clearly from the testimony that I received, I wasn't even sure that this officer knew if he still had it or not, and as it turned out, apparently with some effort, it could be recovered somewhat.

"With regard to the evidence, clearly the law states that the motion should be granted only if there is prejudice, first of all, and that that prejudice cannot be cured by instruction or by jury admonition. [*People v. Jenkins* (2000) 22 Cal.4th 900, 985.]

"I don't see the prejudice. While there is [*sic*] some inconsistencies – and certainly as pointed out by the People, I gave [defense counsel] about as much time as the Court could or felt necessary. It was a short interview. And while I certainly recognize that everybody is understaffed, there certainly was time, if the decision was to be made, to have it transcribed over the weekend.

> "But more importantly, I think that there's very little prejudice which attaches to that late discovery evidence. But in an abundance of caution, the only sanction that I will impose is that the Court will, in its own discretion, give [CALCRIM No.] 306, untimely disclosure of evidence. I think that that's appropriate. And the Court will include that in the jury instructions, but that will be the only sanction."

The court found the instruction was "more than sufficient to cure any perceived prejudice, because I don't see the prejudice involved, but any perceived prejudice that the jury may determine. [T]he instruction is to evaluate the weight and significance of any evidence and consider the effect, if any, on the late disclosure. So I think that would be appropriate pursuant to the case law."

### H. The Cautionary Instruction

During the instructional phase, the court gave CALCRIM No. 306 regarding the discovery violation:

> "Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence to counter opposing evidence or to receive a fair trial. The attorney for the People failed to disclose the audio recording of [A.G.'s] statement within the legal time period. In evaluating the weight and significance of that evidence, you may consider the effect, if any, on the late disclosure."

### I. Analysis

Defendant contends the court abused its discretion when it denied his motion for mistrial because the belated disclosure of the recording violated *Brady* and section 1054.1, et seq. Defendant acknowledges that the recording was provided to his attorney in the midst of trial, but asserts the discovery violation was prejudicial because the recording would have impeached the trial testimony of Officer Jauregui and A.G. Defendant argues he did not have sufficient time to have the interview transcribed, reach an agreement with the prosecutor on a corrected transcript, and play all or portion of the recording to the jury.

Evidence tending to impeach the credibility of a prosecution witness may be deemed favorable to the defense under *Brady*, but defendant has the burden to show prejudice from late discovery. (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1214; *People v. Gatlin, supra,* 209 Cal.App.3d at p. 38.) The late disclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

Defendant has failed to show prejudice. First, it is undisputed that defendant received a copy of the recording on Friday, April 4, 2014, just hours after Officer Jauregui revealed its existence during his trial testimony. This satisfied the statutory requirement of "immediate disclosure of materials that become known during trial. [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 287.) In addition, under *Brady* "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) Defense counsel used the recording when the court reconvened on Monday, April 7, 2014,

25

to extensively impeach Jauregui's prior testimony by having him listen to the recording through headphones, and eliciting his admissions that he had misstated certain aspects of A.G.'s statement.

Despite conducting a lengthy cross-examination of Officer Jauregui, defense counsel moved for a mistrial that day. He complained that he did not have sufficient time over the weekend to obtain a transcript, as a prerequisite for playing the entire recording to the jury. Defendant repeats this argument on appeal. However, there is no evidence defendant tried to have the 15-minute recording transcribed over the weekend. While counsel said it was difficult to have a transcription prepared in a short period of time, there is no evidence that he attempted to start the process on Friday afternoon or Monday morning. Defense counsel made the motion for mistrial on Monday, but he never asked for a continuance to obtain a transcription.

Defendant also complains that the belated disclosure of the recording occurred after A.G. testified and thus prevented him from impeaching A.G. with prior inconsistent statements. He fails to note that A.G. was excused subject to recall. There is no evidence defendant attempted to recall A.G., that he asked for continuance to locate A.G., or that he was unable to do so.

As for the recording itself, defendant never made an offer of proof to the court that the recording contained any exculpatory evidence, or additional impeachment evidence aside from the portions used to cross-examine Officer Jauregui. While defendant complained he lacked sufficient time to obtain a transcript over the weekend, he could have used the nearly 30-day period between the verdict and the sentencing hearing to obtain a transcript as the basis for a new trial motion, which might have demonstrated whether the entirety of the recording aided the defense case.

In the absence of such a transcript or offer of proof, we are left to speculate as to the contents of the recording, and whether it contained any additional material that would have further assisted in the cross-examination of Officer Jauregui or undermined A.G.'s accusations against defendant. "[M]ere speculation that there *might have been* something useful for impeachment purposes ... is not sufficient to demonstrate a *Brady* violation. [Citation.]" (*People v. Ashraf, supra*, 151 Cal.App.4th at p. 1214, italics in original.)

A motion for mistrial "supposes error plus incurable prejudice." (*People v. Gatlin, supra*, 209 Cal.App.3d at p. 38.) A motion based on a discovery violation should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala, supra*, 23 Cal.4th at p. 283.) "It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm. [Citation.]" (*People v. Pinholster* (1992) 1 Cal.4th 865, 941.)

While the officer's late disclosure was unfortunate and inexcusable, we conclude that defendant has failed to meet this burden, and the belated disclosure of the recording was not prejudicial under the circumstances and did not undermine the reliability of the proceedings. Defense counsel ably used the recording to cross-examine Officer Jauregui, who admitted there were inconsistencies between his prior testimony and the recorded interview. The jury was well aware of inconsistencies in A.G.'s statements based on his own trial testimony. However, there is no evidence that the recording contained any exculpatory evidence, or evidence that would have further impeached the testimony of Jauregui and A.G.

1    about the charged offense in count II. Defendant did not request a continuance to
2    recall A.G. as a witness, make an offer of proof as to the contents of the recording,
     or obtain a transcript of the 15-minute interview to preserve appellate review.

3    <u>Bisel</u>, 2016 WL 4211767, at *6–13.

4              *a.    Legal Standard*

5         Due process requires that the prosecution disclose exculpatory evidence within its

6    possession.  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); <u>Cooper v. Brown</u>, 510 F.3d 870, 924

7    (9th Cir. 2007).  This obligation encompasses the duty to discover and produce favorable

8    evidence known to others acting on the government's behalf in the case, such as other agencies

9    involved in the investigation or prosecution of the defendant.  <u>Kyles v. Whitley</u>, 514 U.S. 419,

10   437 (1995); <u>United States v. Zuno–Arce</u>, 44 F.3d 1420, 1427 (9th Cir. 1995).

11        There are three components of a <u>Brady</u> violation: "[t]he evidence at issue must be

12   favorable to the accused, either because it is exculpatory, or because it is impeaching; the

13   evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

14   must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999); <u>see also</u> <u>Banks v. Dretke</u>,

15   540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005).  The third element,

16   prejudice, is also described as materiality.  <u>See</u> <u>Benn v. Lambert</u>, 283 F.3d 1040, 1053 n. 9 (9th

17   Cir. 2002) (explaining that, "for <u>Brady</u> purposes, the two terms have come to have the same

18   meaning").  Evidence is material under <u>Brady</u> if there is a "reasonable probability that, had the

19   evidence been disclosed to the defense, the result of the proceeding would have been different."

20   <u>Kyles</u>, 514 U.S. at 433–34 (internal quotation marks and citation omitted).

21             *b.    Analysis*

22        The state court reasonably found that Petitioner's rights under <u>Brady</u> were not violated.

23   The evidence was not suppressed by the prosecution; it was instead discovered late and

24   immediately provided to the defense upon discovery.  The defense was also able to use the

25   recording to impeach the witnesses during cross-examination.  See <u>United States v. Higgins</u>, 75

26   F.3d 332, 335 (7th Cir. 1996) ("Disclosure even in mid-trial suffices [for <u>Brady</u> purposes] if time

27   remains for the defendant to make effective use of the exculpatory material.")  Thus, the second

28   prong of <u>Brady</u> was not established.

Petitioner also fails to show he was prejudiced.  Petitioner had sufficient time to review the recording and use it for impeachment purposes.  Petitioner did in fact impeach the witnesses with the recording.  As noted by the state court, defense counsel impeached Officer Jauregui by playing the recording for him and contrasting his testimony with the actual recording.  Petitioner fails to show how earlier discovery of the recording would have affected the outcome in any way.

Thus, the state court's decision was not contrary to, or an unreasonable application of, Brady.  The claim should be denied.

### 3.    Ineffective Assistance of Counsel

In his second, fourth, and fifth claims, Petitioner alleges defense counsel was ineffective in the following ways: 1) failing to obtain a transcript of the late recording by Officer Jauregui (claim 2); 2) failing to communicate a 4-year plea deal (claim 4); and 3) failing to object to the jury instructions (claim 5).

#### a.    Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a Petitioner has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

1    Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

2         With the passage of the AEDPA, habeas relief may only be granted if the state-court

3    decision unreasonably applied this general Strickland standard for ineffective assistance.

4    Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

5    federal court believes the state court's determination under the Strickland standard "was incorrect

6    but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

7    Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

8    is "doubly deferential" because it requires that it be shown not only that the state court

9    determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

10   Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

11   state court has even more latitude to reasonably determine that a Petitioner has not satisfied that

12   standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

13   application was unreasonable requires considering the rule's specificity.  The more general the

14   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

15              *b.*     *Analysis – Failure to Obtain Transcript*

16        Petitioner contends that defense counsel failed to transcribe the recording of Officer

17   Jauregui's interview of victim A.G., and failed to admit the recording into evidence.  Petitioner

18   raised the claim to the state courts, and the California Supreme Court summarily denied the claim.

19        As set forth in section 2 above, the tape recording of the interview was discovered mid-

20   trial.  Although defense counsel had sufficient time to review the recording, and did in fact do so,

21   he did not admit the recording into evidence during trial.  Instead, defense counsel played

22   portions of the recording to Officer Jauregui during cross-examination and contrasted his

23   testimony with the recording.  Thus, defense counsel was able to impeach the officer by using the

24   statement.  Subsequently, defense counsel moved for a mistrial claiming he did not have time to

25   transcribe the recording and then request the recording be placed into evidence.  The trial court

26   denied the motion for mistrial.

27        Petitioner claims that the failure to play the recording for the jury and admit the recording

28   into evidence prejudiced him because he was unable to highlight the victim's fear of going to jail.

29

Petitioner fails to show that counsel erred, or that he was prejudiced from counsel's alleged error. Petitioner challenges the manner in which counsel chose to use the recording, but he fails to show that counsel's decision was unreasonable. Instead of playing the entire recording, which may have contained portions prejudicial to Petitioner, defense counsel chose to admit only those portions he could utilize to impeach the witness. A fairminded jurist could agree that counsel's decision was reasonable. Petitioner also cannot demonstrate prejudice because the recording was never presented to the state courts. Thus, his claim that the recording contained helpful information is speculative, and should be denied.

*c.*  *Analysis – Failure to Communicate Four-Year Plea Offer*

Petitioner next alleges defense counsel failed to communicate a four-year plea offer. The claim was raised in Petitioner's state habeas petitions. In the last reasoned decision, the Fresno County Superior Court rejected the claim as follows:

> On March 28, 2017, the Court requested an informal response. In support of the informal response, the Court directed Respondent to respond to Petitioner's assertion that his attorney failed to provide any response to his request for clarification regarding the terms of a plea offer that was communicated to his paralegal on February 5, 2014 under which he would have been sentenced to a term of four years in state prison. Specifically, the Court directed Respondent to provide a declaration from attorney Scott Baly addressing what, if any, advice and/or representations were made to the Petitioner regarding the terms of that plea offer.
>
> On May 25, 2017, Respondent filed the informal response. In the informal response, Respondent maintains that there was no plea offer open when Mr. Baly was reappointed as his counsel on February 18, 2014, and there was therefore "nothing by way of an offer for Mr. Baly to explain or explore." In support of the informal response, Respondent has provided a declaration from attorney Scott Baly.
>
> In his declaration, Mr. Baly states, in part: "On February 19, 2014 (sic) Bisel requested to have a lawyer appointed back on his case. Bisel made this request after his case had been assigned out for trial. The Fresno Public Defender's Office was re-appointed and the case was continued to start the trial on April 1, 2014. *After my re-assignment to the case Deputy District Attorney Bill Lacy told me that Bisel had rejected a four year prison offer while he was pro per. That offer was no longer available*. [...] Bisel did mention to me a willingness to accept a plea bargain for a misdemeanor charge of PC 272 contributing to the delinquency of a minor. *To my suggestion of a felony plea bargain, Bisel said he "won't even take probation."*
>
> In support of the informal response, Respondent has also included a declaration from Senior Deputy District Attorney William Lacy. In his declaration, Mr. Lacy states, in part, that: "On February 18, 2014, the case was assigned to Department

30

61 for jury trial. Mr. Bisel still represented himself. Present with him was Mr. Hammel, his court appointed paralegal. Although I have only a modest recollection of the details of the occasion of the case assignment for trial, *it [is] my practice to resolve all issues of outstanding settlement offers prior to trial assignment [...] it is my recollection that at the time of the trial assignment on February 18, 2014, there was no outstanding offer of settlement;* [...] Mr. Baly's recollection set forth in his Declaration that Mr. Bisel had rejected the prosecution's settlement offer (whether by outright rejection or counter proposal of a misdemeanor), as well as his observation that '[t]hat offer was no longer available[.]' is entirely consistent with my own recollection as well as my customary trial practice."

On July 5, 2017, Petitioner filed the informal reply. In the informal reply, Petitioner asserts that the plea offer under which he would have been sentenced to a term of four years in state prison was not communicated to him until February 17, 2014 and that Respondent has failed to provide any evidence that he rejected the offer.

**Discussion**

In order to demonstrate ineffective assistance of counsel, a Petitioner must first show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 690-92.) In addition to showing that counsel's performance was deficient, a petitioner must also demonstrate prejudice in order to obtain relief. (*Strickland v. Washington, supra*, 466 U.S. 668, 690-92; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) To demonstrate prejudice, the petitioner must demonstrate that there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been more favorable to the petitioner. (*In re Alvernaz* (1992) 2 Cal.4th 924, 936-937.)

Moreover, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. 668, 697; see also *In re Cox* (2003) 30 Cal.4th 974, 1019-20.)

With respect to claims of ineffective assistance of counsel in the context of the decision to enter a plea, the California Supreme Court has noted that plea bargaining is a critical stage of the criminal proceeding at which a defendant is entitled to the effective assistance of counsel. (*In re Alvernaz* (1992) 2 Cal.4th 924, 933.) Further, in deciding whether to enter a plea, a petitioner must be presented with a "'voluntary and intelligent choice among the alternative courses of action open to the defendant.'" (*Hill v. Lockhart* (1985) 474 U.S. 52, 56.) The voluntariness of a plea depends on "whether counsel's advise 'was within the range of competence demanded of attorneys in criminal cases.'" (*Ibid.*) "Although [the decision to plead guilty pursuant to a plea bargain instead of proceeding to trial is a decision ultimately] made by the defendant, it is the attorney, not the client, who is particularly qualified to make an informed evaluation of a proffered plea bargain." (*In re Alvernaz, supra*, 2 Cal.4th 924, 933.)

In his petition, Petitioner states that Mr. Baly did not discuss the plea offer with him: "Mr. Baly didn't visit Petitioner until March 25, 2014, saying he'd not

31

received the Feb. 20th letter, and only announced he was, 'ready for trial.' Mr. Baly wouldn't discuss the plea bargain offer, or any plea bargain, or answer whether or not he'd communicated with the prosecutor, Mr. Lacy." Furthermore, Petitioner states that "[w]hen Petitioner asked Mr. Baly if he'd discussed any plea with the prosecutor, he only offered a blank stare and said he had to leave – which he then did." According to Petitioner, this "was the only meeting which took place between Mr. Baly's appointment on February 18th, and start of trial on April 1, 2014."

While Petitioner disputes that he rejected the plea offer under which he would have been sentenced to a term of four years in state prison prior to his attorney's re-appointment on February 18, 2014, both attorney Scott Baly and Senior Deputy District Attorney William Lacy, have provided declarations under penalty of perjury representing that the offer was no longer available at the time Mr. Baly was re-appointed as counsel. In order to demonstrate that he was prejudiced by his attorney's deficient performance, Petitioner "must prove there is a reasonable probability that, but for counsel's deficient performance, the defendant would have accepted the proffered plea bargain and that in turn it would have been approved by the trial court." (*In re Alvernaz, supra,* 2 Cal.4th 924, 937.)

It is clear that the prosecution did make an offer under which Petitioner would have been sentenced to a term of four years prior to trial. Nonetheless, Senior Deputy District Attorney William Lacy states in his declaration that it is his "practice to resolve all issues of outstanding settlement offers *prior to trial assignment.*" Petitioner was representing himself prior to February 18, 2014 when attorney Scott Baly was re-appointed as his counsel *after* the matter had been assigned for trial. Therefore, Mr. Lacy's representation that the offer was no longer available was consistent with his stated standard practice of resolving all settlement offers prior to trial assignment. In fact, the transcript of the hearing that was conducted on February 18, 2014 shows that Mr. Lacy argued that the prosecution would be prejudiced by any further delay in bringing the matter to trial.

> MR. LACY: You know, Mr. Bisel was advised of the perils and the difficulties of going pro per. I was present when that happened. He did it despite the Court's warning that that was probably not a very good idea. The preliminary hearing was done in July. He's been pro per since then. I believe that Mr. Bisel is just attempting to delay this trial. […] The People would be prejudiced by any delay. And the People are ready to proceed.

(*People v. Gregory Eugene Bisel*, Case No. F12905849, February 18, 2014 at p. 18: 7-26.)

Moreover, Petitioner alluded to the fact that Mr. Lacy had made a prior plea offer at the February 18, 2014 hearing but he did not make any inquiries concerning it or express any interest in it. Rather, Petitioner appeared confident that he would ultimately be successful at trial.

> MR. BISEL: It's been frustrating to get discovery on this case. It's been frustrating to get – once I have discovery and once – now that I've done all the work and I'm very, very sure of the motions and that this case should have been dismissed many, many months ago – and not what you're thinking, Mr. Lacy. There's things that you don't even know about that are going to surprise you; I'm quite sure of that. But now we have – Mr. Lacy has made an offer recently. He approached Mr. Hammel. And then he said

that he would be using Evidence Code 1108(a) against me where in a criminal action in which a defendant is accused of a sexual offense –

THE COURT: I'm aware of the statute.

MR. BISEL: Okay. But he had not given me anything on – okay, 1008(b), in an action in which evidence is to be offered under this section, the People shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of the testimony that is expected to be offered in compliance with the provisions of Section 1054.7 of the Penal Code, which we know is a 30-day. I just now got that, you know, just now was alerted to that. And so he's reopened the old case, apparently from '97. I have all these motions that are on the cusp of just being presented. […]

(*People v. Gregory Eugene Bisel*, Case No. F12905849, February 18, 2014 at p. 12: 10-26 & p. 1-6.)

Under the present circumstances, the Court finds that Petitioner has failed to demonstrate a reasonable probability that there was an outstanding plea offer on February 18, 2014, that he would have accepted the outstanding offer if Scott Baly had provided objectively reasonable counsel regarding it, and that the plea offer would also have been approved by the trial court. (*In re Alvernaz, supra*, 2 Cal.4th 924, 937 ["[T]he second prong of prejudice must be met in order to demonstrate ineffective representation. To establish prejudice, a defendant must prove there is a reasonable probability that, but for counsel's deficient performance, the defendant would have accepted the proffered plea bargain and that in turn it would have been approved by the trial court.']".)

[¶…¶]

Here, the Court finds that Petitioner has failed to demonstrate a reasonable probability that he was prejudiced by his attorney's failure to adequately advise him regarding the prosecution's plea offer. (*Strickland v. Washington, supra*, 466 U.S. 668, 697.)

(Doc. 43-6 at 3-10.)

In rejecting the claim, the state court correctly applied the <u>Strickland</u> standard. The only question for this Court is whether that application was unreasonable. The Court finds it was not.

The state court noted that the trial record and the declarations by defense counsel and the prosecutor showed that a four-year plea offer was indeed made; however, that offer was made while Petitioner was pro per and rejected by Petitioner during that time. The offer was no longer available once defense counsel was reappointed. Defense counsel cannot be faulted if the plea offer was no longer available once he was reappointed. The record also shows that even if a plea offer had been made after defense counsel was reappointed, Petitioner would have rejected it. Petitioner had indicated that he would not "even take probation" if offered a felony plea bargain.

1    (Doc. 43-6 at 4.)  Therefore, Petitioner fails to demonstrate that counsel erred, or that he suffered

2    any prejudice.

3                     d.      *Analysis – Jury Instructions*

4          Petitioner next alleges defense counsel erred by failing to object to certain jury

5    instructions.  Specifically, he claims that the jury was erroneously instructed with CALCRIM No.

6    1191 which permitted the jury to evaluate one charged offense using the preponderance of the

7    evidence standard and using that charged offense to find Petitioner had the propensity to commit

8    sexual crimes.  Petitioner also contends that CALCRIM No. 222 given to the jury was missing the

9    first page.  Neither contention is meritorious.

10         As correctly noted by Respondent, CALCRIM No. 1191 made no mention of using

11   charged acts to find Petitioner had a propensity to commit sexual crimes.  Rather, the instruction

12   permitted the jury to find Petitioner had the propensity to commit sexual crimes, but only if the

13   jury found true the uncharged offenses using a preponderance of the evidence standard. (Doc. 75-

14   2 at 85.)  The jury was cautioned that this conclusion was only one factor to consider and was not

15   sufficient by itself to prove that Petitioner was guilty of the charged offense. (Doc. 75-2 at 85-87.)

16   The jury was instructed that the prosecution must still prove the charged offense beyond a

17   reasonable doubt. (Doc. 75-2 at 87.)  In light of the foregoing, Petitioner fails to show that

18   counsel erred by failing to object to the instruction.

19         As to CALCRIM No. 222, although the copy of instructions included in the Clerk's

20   Transcript on Appeal is missing the first page of CALCRIM No. 222, (Doc. 75-2 at 130), the

21   instruction was read to the jury in full.  (Doc. 75-9 at 36-37.)  Since the instruction was given,

22   defense counsel cannot be faulted for failing to object.  For the same reason, Petitioner cannot

23   demonstrate prejudice.  Thus, the state court denial of the claim was not unreasonable.

24             4.     Ineffective Assistance of Appellate Counsel

25         In his final claim for relief, Petitioner alleges appellate counsel was ineffective in: 1) filing

26   a very weak appeal; 2) withholding the record on appeal from Petitioner for two and one-half

27   years; and 3) failing to provide Petitioner with a copy of the recorded interview by Officer

28   Jauregui of victim A.G.  (Doc. 31 at 14.)  The first two contentions were never presented to the

California Supreme Court; therefore, they are unexhausted.  28 U.S.C. § 2254(b).  In any case, they are also without merit.

Claims of ineffective assistance of appellate counsel are also reviewed according to Strickland.  Strickland, 466 U.S. at 687-88; Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986).  To reiterate, Petitioner must establish that counsel's deficient performance fell below an objective standard of reasonableness, Strickland, 466 U.S. at 687-88, and he must establish that he suffered prejudice, Id. at 694.

Petitioner first claims that appellate counsel submitted a weak appeal.  The claim is conclusory as he does not state how or why the appeal was weak, or how appellate counsel would have been successful with a different appeal.  See Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995) ("conclusory suggestions that his trial and state appellate counsel provided ineffective assistance fall far short of stating a valid claim of constitutional violation").  Likewise, Petitioner fails to state why he was prejudiced from appellate counsel's alleged failure to timely provide a copy of the record.

As to the claim that appellate counsel failed to provide Petitioner with a copy of the recording, this recording was never transcribed or entered into evidence.  Appellate counsel is under no duty to pursue evidence outside of the appellate record.  Petitioner also fails to show how he was prejudiced, and only speculates that the transcribed recording could have been helpful.  As previously discussed, defense counsel used the recording reasonably, and there is no reason to conclude the result would have been different had the recording been transcribed and entered into evidence.  The claim should be denied.

**IV.    RECOMMENDATION**

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party

1   may file written objections with the Court and serve a copy on all parties.  Such a document

2   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

3   to the Objections shall be served and filed within fourteen (14) court days (plus three days if

4   served by mail) after service of the Objections.  The Court will then review the Magistrate

5   Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file

6   objections within the specified time may waive the right to appeal the Order of the District Court.

7   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 17, 2022**                             _/s/ Sheila K. Oberto_
                                                                     UNITED STATES MAGISTRATE JUDGE